REVISED - April 1, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-11182
_____


UNITED STATES OF AMERICA, EX REL.,

                                        Plaintiff-Intervenor,

CAROL RAE COOPER FOULDS,

                                        Plaintiff-Appellee,

                        versus

TEXAS TECH UNIVERSITY, ET AL.,

                                        Defendants,

TEXAS TECH UNIVERSITY; TEXAS TECH
UNIVERSITY HEALTH SCIENCE CENTER,

                                        Defendants-Appellants.
_____

Appeal from the United States District Court for the
Northern District of Texas
_____
March 29, 1999
Before JOLLY, BARKSDALE, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal speaks of a qui tam action brought by Carol Rae Cooper Foulds, on behalf of the United States, against Texas Tech University and Texas Tech University Health Sciences Center for violations of the False Claims Act, 31 U.S.C. § 3729 et seq. (West Supp. 1998). We must initially decide a jurisdictional

issue-- whether under the Eleventh Amendment private citizens acting as qui tam plaintiffs can institute such suits against the sovereign states. Because we hold that the Eleventh Amendment bars this suit, we lack the constitutional authority to decide the second-- and broader--issue presented in this appeal of whether the False Claims Act creates a cause of action, at all (whether by an individual or the United States government), against an individual state when that state knowingly submits false or fraudulent claims for payment to the United States. In short, we simply hold that the Eleventh Amendment divests the federal courts of jurisdiction over this qui tam action brought against Texas Tech University and Texas Tech University Health Sciences Center ("Texas defendants").

I

A

Foulds possesses information that she believes will bring to light a massive number of fraudulent claims submitted to the United States. She obtained this information as a dermatology resident at the Texas Tech Health Sciences Center ("TTHSC"). Foulds worked at various clinics run by TTHSC. She examined patients, made diagnoses, and prescribed treatment for patients. Resident physicians performed these services, Foulds alleges, without any supervision by the staff physicians. She says that after residents had rendered these services without oversight,

2

staff physicians routinely signed patient charts and Medicare/Medicaid billing forms certifying that the services were personally performed by the staff physicians or by the staff physicians' employees under their personal direction. Foulds alleges no simple clerical error. Indeed, she estimates that the defendants have submitted almost one-half million false claims over a period of ten years.

This alleged falsification of documents forms the basis for Foulds's action under the False Claims Act ("FCA" or "Act"). That Act creates civil liability for, inter alia, "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false claim for payment or approval." 31 U.S.C. § 3729(a)(1) (emphasis supplied).[1] Foulds and the United States argue that the term "person" includes a state. The Texas defendants disagree, arguing that "person" does not include a sovereign state.

Aside from the question of whether the Act's language subjects states to potential liability, Foulds has other hurdles to clear. An uninterested third party ordinarily cannot seek relief for the United States' injuries suffered at the hands of another. See, e.g., Valley Forge Christian College v. Americans

---

[1]The Act sets the penalty for violating this provision between $5,000 and $10,000, plus three times the amount of damages that the United States sustains. 31 U.S.C. § 3729(a).

<u>United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 474 (1982) (recognizing the principle that a plaintiff generally must assert his own rights, and not the rights of third parties). Many a good citizen, without hope of personal reward, might choose to expose such corruption to allow the government to recoup its losses. The FCA, however, provides a mechanism to coax the less altruistic to come forward. Section 3730(b) of the Act allows private persons to "bring a civil action for a violation of § 3729 for the person and for the United States Government." 31 U.S.C. § 3729(b)(1). To be sure, the statute provides for what can amount to massive rewards for a person who undertakes this task.[2]

For hundreds of years, these proceedings have been labeled "qui tam" actions.[3] A qui tam plaintiff under the FCA must file

---

[2]The private party's reward for prosecuting the case depends, in part, upon whether the government decides to intervene. If the government chooses to intervene, the relator "shall receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim." 31 U.S.C. § 3730(d)(1). If the government decides not to intervene, the relator collects "not less than 25 percent and not more than 30 percent of the proceeds." <u>Id.</u> § 3730(d)(2). The relator may also collect reasonable expenses, attorneys' fees and costs. <u>Id.</u> §§ 3730(d)(1),(2). Foulds seeks to collect a Texas-sized reward based on her allegations of over 400,000 false claims (which could generate fines of between $5,000 and $10,000 each) and over $20 million in overpayments (which § 3729(a) would treble).

[3]This abbreviated Latin phrase is shorthand for "he who as much for the king as for himself." <u>See generally</u> Note, <u>The History and Development of Qui Tam</u>, 1972 Wash. U. L.Q. 81, 83.

her complaint under seal and deliver copies of the complaint to the United States.  Id. § 3730(b)(2).  The United States then must decide within sixty days, unless granted an extension, whether to intervene and prosecute the action itself or whether to take on a passive role and allow the qui tam plaintiff (also called a "relator") to prosecute the action.  Id. § 3730(b)(4).  In the instant case, the United States has not intervened in the action leading to this appeal.

B

This appeal presents an additional claim.  According to Foulds, her decision to blow the whistle on the allegedly fraudulent activities led to retaliatory conduct by the chairman of the dermatology department.[4]  Foulds contends that she first notified Texas Tech University's general counsel of the false claims in the fall of 1993.  She alleges that soon thereafter she received derogatory memoranda from the chairman of the dermatology department and was subsequently placed on probation.  Section 3730(h) of the FCA provides remedies for those employees harassed by their employers because of lawful acts performed in furtherance of qui tam actions under the Act.  The "employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection."  31 U.S.C. §

---

[4]Foulds has not named this, or any, individual as a defendant in this suit.

5

3730(h).

## II

Foulds filed her complaint with the district court in August of 1995. This complaint remained under seal until the district court issued an order in September of 1996, denying the United States' request for an extension of time during which it could determine whether to intervene.[5] According to assertions made by the United States at oral argument, the federal government simply did not have the time necessary to determine whether this case warranted its intervention. Shortly after the district court issued the order denying the government's request for an extension, two of the defendants, Texas Tech University and Texas Tech Health Sciences Center ("Texas defendants"),[6] filed a motion to dismiss the qui tam action pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. The Texas defendants based their motion to dismiss on four arguments: (1) the Eleventh

---

[5]To date, the United States has intervened solely for purposes of appeal. It would still be possible, however, for the United States to intervene at the district court level if proceedings were to continue. Section 3730(c)(3) states in part: "When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause."

[6]In the original complaint, Foulds named five defendants: Lubbock County, Lubbock County Hospital District, University Medical Center, Texas Tech University, and Texas Tech Health Sciences Center. Only the latter two defendants are before us on this appeal.

Amendment precludes a private citizen from bringing a qui tam suit against the sovereign states for alleged violations of the FCA; (2) the Eleventh Amendment bars private citizens from naming states as defendants to a claim seeking a retaliation remedy under § 3730(h) of the FCA; (3) states are not "persons" for purposes of the FCA; and (4) Foulds failed to plead fraud with particularity.[7]

The district court denied the Texas defendants' motion to dismiss. Noting that a ruling on a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction must precede any decisions on other Rule 12 motions, the court first addressed the defendants' Eleventh Amendment arguments.

The Texas defendants argued that the principles recognized in Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), apply to this case. In Seminole Tribe, the Supreme Court announced a two- step analysis for determining whether Congress has legitimately denied the states the sovereign immunity recognized under the Eleventh Amendment. First, a court must determine whether "Congress has 'unequivocally expresse[d] its intent to abrogate the immunity.'" Id. at 55 (citation omitted). Second, the court must decide "whether Congress has acted

---

[7]In its order responding to the motion to dismiss, the district court did not comment on the fourth argument. We express no opinion as to it.

'pursuant to a valid exercise of power.'" Id. (citation omitted). With regard to the second inquiry, the Supreme Court held that Congress could not abrogate Eleventh Amendment immunity simply by enacting legislation under its general grant of Article I legislative powers. Id. at 72-73. Controlling Supreme Court precedent has recognized only one valid source of Congressional power that would allow the abrogation of a state's immunity from suit by its citizens: § 5 of the Fourteenth Amendment. Id. at 59, 72-73. The Texas defendants have argued that, with respect to the False Claims Act, Congress' only source of legislative power is Article I. Consequently, there has been no abrogation of the Eleventh Amendment bar to this suit.

The district court quickly brushed aside the applicability of Seminole Tribe. The court decided that it need not address Seminole Tribe's holding because the defense of sovereign immunity from suit under the Eleventh Amendment was not presented here inasmuch as the Eleventh Amendment did not apply to suits by the United States against a state, which, it held, a qui tam action is in fact. United States ex rel. Foulds v. Texas Tech Univ., 980 F. Supp. 864, 870 (N.D. Tex. 1997). In reaching this conclusion, the district court followed the path of the Fourth Circuit in United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Ctr., 961 F.2d 46 (4th Cir. 1992) ("Milam"). The Milam court decided first that the United States was the

8

"real party in interest" in qui tam suits under the FCA. It then leapt to the conclusion that states have no sovereign immunity defense against a private citizen relator--even if the United States chose not to intervene--because states possess no immunity from suits brought by the United States. Thus, the district court found that Seminole Tribe had no bearing on this action against the Texas defendants; those defendants simply had no sovereign immunity defense in qui tam actions. Foulds, 980 F. Supp. at 870.

The district court then decided that rejection of the Eleventh Amendment challenge to Foulds's § 3730(h) retaliation claim easily followed. Although the United States would reap no monetary award pursuant to a successful retaliation claim, the district court found that

> [i]f section 3730(h) is eviscerated, then the Government is truly the one that will suffer the greatest harm. This is because a "whistleblower" will not be encouraged to come forward with information for fear of being retaliated against.

Id. at 871. Thus, the district court reasoned that sovereign immunity should not prevent the § 3730(h) action against the Texas defendants.

Having disposed of the Eleventh Amendment issues, the district court proceeded to address the remaining question: Does the term "person," under the FCA, encompass states? Although it recognized that courts ordinarily do not understand the term

9

"person" to include the sovereign states, the court rejected this general rule because

> this would be an illogical step to make in light of [the district] court's finding that the Eleventh Amendment does not bar Foulds's suit against [the Texas defendants].

Id. at 871.  This somewhat questionable reasoning[8] led the district court to dismiss the Texas defendants' 12(b)(6) motion.

After issuing its order denying the Texas defendants' motions, the district court issued a stay pending this interlocutory appeal.  We have jurisdiction over this interlocutory appeal pursuant to the collateral order doctrine.  See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993) (holding that "States and state entities . . . may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity").

III

A

We begin and end with the jurisdictional question presented by the Eleventh Amendment.  Generally, our court would first

---

[8]The reasoning is questionable because the district court could have decided that private citizens can use the qui tam device to bring states to court, while yet denying those citizens relief because the particular statute at issue (the FCA) did not subject states to liability.  The statutory interpretation issue need not be determined by resolution of the Eleventh Amendment issue.

10

interpret the ambiguous statute before deciding any constitutional issues. Indeed, courts' interpretive results are often influenced by their desire to avoid potential constitutional problems. See, e.g., Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring); United States v. Reeves, 752 F.2d 995, 1001 (5th Cir. 1985). Precisely because this has been the ordinary approach (deciding the statutory question before the constitutional question), we think it is jurisprudentially important to discuss first the reasons for disregarding it in this case.

The Eleventh Amendment's admonition is jurisdictional in nature:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. While often noted for preserving state sovereignty, the Amendment only accomplishes this end through jurisdictional limitation. Puerto Rico Aqueduct, 506 U.S. at 144 ("[The Eleventh Amendment's] withdrawal of jurisdiction effectively confers an immunity from suit.") Its negative instruction on how to construe federal judicial power operates as an additional boundary on that power, supplementing the restraints on judicial power already implicitly provided in

11

Article III of the Constitution. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238 (1985) (quoting Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 98 (1984)) ("[T]he significance of [the Eleventh Amendment] 'lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III' of the Constitution.").[9]

---

[9]In a recent case, the Supreme Court decided an Article III question before reaching an Eleventh Amendment issue and stated in a footnote that "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not co-extensive with the limitations on judicial power in Article III." Calderon v. Ashmus, 118 S.Ct. 1694, 1697 n.2 (1998) (citation omitted). Nonetheless, the historical context surrounding the enactment of the Eleventh Amendment supports the position that the Eleventh Amendment, if not part and parcel of the Article III restrictions, is certainly intertwined with Article III jurisprudence. The Supreme Court's interpretation of Article III powers in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419 (1793), prompted Congress' "outraged reversal" of that decision through enactment of the Eleventh Amendment. DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS 99 (1985). In other words, Congress and the state legislatures enacted the Eleventh Amendment as a corrective retort to a judicial interpretation of Article III that was offensive. See also Seminole Tribe, 517 U.S. at 72-73 ("The Eleventh Amendment restricts the judicial power under Article III . . . ."); Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991) (Eleventh Amendment's sovereign immunity principle limits the judicial authority in Article III).

The Supreme Court (in an opinion issued after Calderon) has explicitly recognized that it has not yet decided whether Eleventh Amendment immunity is a matter of subject matter jurisdiction. Wisconsin Dept. of Corrections v. Schacht, 118 S.Ct. 2047, 2054 (1998); see also id. at 2055 (Kennedy, J., concurring) (noting that the Court has treated the Eleventh Amendment as a limit on courts' subject matter jurisdiction in some respects, but as similar to personal jurisdiction requirements in other respects). (We note, however, that courts

12

must also decide issues of personal jurisdiction before ruling on the merits. Marathon Oil Co. v. A.G. Ruhrgas, 145 F.3d 211, 222-23 (5th Cir.) (en banc), cert. granted, 119 S.Ct. 589 (1998).) While the Supreme Court has left this question open, our court has repeatedly referred to the Eleventh Amendment's restriction in terms of subject matter jurisdiction. See, e.g., Warnock v. Pecos County, Texas, 88 F.3d 341, 343 (5th 1996) ("Because [Eleventh Amendment] sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice."); John G. and Marie Stella Kennedy Mem'l Found. v. Mauro, 21 F.3d 667, 673-75 (5th Cir. 1994) (finding that the district court erred in ruling on motion for partial summary judgment after the Eleventh Amendment deprived the court of subject matter jurisdiction); Stem v. Ahearn, 908 F.2d 1, 4 (5th Cir. 1990) (when applicable, Eleventh Amendment will divest federal courts of subject matter jurisdiction); McDonald v. Board of Miss. Levee Comm'rs, 832 F.2d 901, 906 (5th Cir. 1987) (quoting Crane v. Texas, 759 F.2d 412, 415 (5th Cir. 1985)) ("[E]leventh amendment immunity is a jurisdictional issue that 'cannot be ignored, for a meritorious claim to that immunity deprives the court of subject matter jurisdiction of the action.'"); Darlak v. Bobear, 814 F.2d 1055, 1064 (5th Cir. 1987) (dismissal of case on Eleventh Amendment grounds recognized court's lack of subject matter jurisdiction and did not constitute a judgment on the merits); Clark v. Tarrant County, Texas, 798 F.2d 736, 739 (5th Cir. 1986) (court lacked subject matter jurisdiction over § 1983 claims because of Eleventh Amendment). Until the Supreme Court, Congress, or an en banc panel of this court reverses this practice, we must continue it. Barber v. Johnson, 145 F.3d 234, 237 (5th Cir. 1998) (stating the Fifth Circuit rule). See also Seaborn v. Florida, 143 F.3d 1405, 1407 (11th Cir. 1998) (assertion of Eleventh Amendment immunity challenges a court's subject matter jurisdiction and must be resolved before a court may address the merits of the underlying claim); Brown v. North Carolina Div. of Motor Vehicles, No. 97-2784, 1999 WL 66089, at *11 n.* (4th Cir. Feb. 12, 1999) (affirming dismissal for lack of subject matter jurisdiction based on Eleventh Amendment immunity, and then refusing to decide other statutory and constitutional issues); Doe v. University of Illinois, 138 F.3d 653, 656 n.2 (7th Cir. 1998) (Eleventh Amendment immunity defense is a question of courts' subject matter jurisdiction); ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1186 n.8 (10th Cir. 1998) (noting that courts should avoid reaching the merits of a constitutional issue when the case may be decided on statutory grounds, but

13

It is the Eleventh Amendment's restraint on "Judicial power" that requires us to confront the Eleventh Amendment before employing our power to interpret statutory text.

Although parties may (and do in this case) present their arguments in the alternative, we cannot hand down a decision in this fashion. To rule on a merits question before, or in addition to, answering the omnipresent jurisdictional question would contravene the well-established principle that the federal courts may not issue advisory opinions. See Marathon Oil Co. v. A.G. Ruhrgas, 145 F.3d 211, 222-23 (5th Cir.)(en banc) ("Ruhrgas") (adopting the reasoning in Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674 (2d Cir. 1990), which stated that when a defendant moves for dismissal under Rule 12(b)(1), and on other grounds, the court should consider the 12(b)(1) motion first since other defenses become moot and need

_____

recognizing that courts must first face the constitutional issue of state sovereign immunity because it presents a controlling jurisdictional question); Snoeck v. Brussa, 153 F.3d 984, 988 (9th Cir. 1998) (affirming district court's dismissal on Eleventh Amendment grounds and, therefore, finding it unnecessary to address standing issue). It bears mention that a dismissive footnote in Gordon v. Texas, 153 F.3d 190, 196 n.4 (5th Cir. 1998), arguably asserts that the Eleventh Amendment does not restrict a court's subject matter jurisdiction. To the extent that the Gordon opinion makes this assertion, we cannot be bound by it. The most recent Supreme Court decision (Schacht) has expressly recognized that the Court has never decided this issue. Schacht, 118 S.Ct. at 2054. Thus, our earlier circuit precedent continues to bind us. Where two panel decisions conflict, the prior decision constitutes the binding precedent.

14

not be determined if the court must dismiss the complaint for lack of subject matter jurisdiction), cert. granted, 119 S.Ct. 589 (1998).  In sum, we cannot hold that we possess no authority to hear a case, and then proceed to decide the statutory issue presented in the case.  Steel Co. v. Citizens for a Better Env't, 118 S.Ct. 1003, 1016 (1998); Ruhrgas, 145 F.3d at 216 ("[O]ur jurisdiction must be considered at the outset of a case.").

Nor can we assume jurisdiction to decide that the statute creates no cause of action and then brush away the jurisdictional question as unnecessary to address for the reason that, in either event, the sum of the relief granted equals zero.  The Supreme Court has recently, and flatly, rejected any "doctrine of hypothetical jurisdiction"[10] required for such a holding.  Steel Co., 118 S.Ct. at 1012.[11]  Under this hypothetical approach,

---

[10]The "doctrine of hypothetical jurisdiction" is a phrase coined by the Ninth Circuit.  United States v. Troescher, 99 F.3d 933, 934 n.1 (1996).

[11]In Ruhrgas, the en banc opinion quotes the relevant language in Steel Co. rejecting the doctrine of hypothetical jurisdiction.  Appended to this quotation is the parenthetical "(majority opinion)."  Ruhrgas, 145 F.3d at 216.  It is not entirely clear, however, that this portion of the Supreme Court's opinion attracted five votes.  Justices Breyer, Stevens, Souter, and Ginsburg expressed disagreement with an absolute rejection of hypothetical jurisdiction.  Steel Co., 118 S.Ct. at 1020-21 (Breyer, J., concurring); id. at 1031-32 (Stevens, J., concurring); id. at 1032 (Ginsburg, J., concurring).  Although Justice O'Connor said at the beginning of her concurring opinion (which Justice Kennedy joined) that she joined the Court's opinion, she penned an equivocal passage concerning the doctrine of hypothetical jurisdiction:

15

courts assumed, usually for the sake of simplicity, that they possessed jurisdictional authority over the case, and then decided whether the relevant statute created a cause of action. See, e.g., United States v. Tonry, 605 F.2d 144, 148 n.12 (5th Cir. 1979); Smith v. Avino, 91 F.3d 105, 108 (11th Cir. 1996); Browning-Ferris Indus. v. Muszynski, 899 F.2d 151, 154-60 (2d Cir. 1990). As the Supreme Court has decided, however, this

---

> I . . . agree with the Court's statement that federal courts should be certain of their jurisdiction before reaching the merits of a case. . . . I write separately to note that, in my view, the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in "reserv[ing] difficult questions of . . . jurisdiction when the case alternatively could be resolved on the merits in favor of the same party."

Steel Co., 118 S.Ct. at 1020 (O'Connor, J., concurring) (quoting Norton v. Mathews, 427 U.S. 524, 532 (1976)). But see Fidelity Partners, Inc. v. First Trust Co. of New York, 142 F.3d 560, 565 (2d Cir. 1998) (Supreme Court has rejected doctrine of hypothetical jurisdiction in Steel Co.); Seaborn v. Florida, 143 F.3d 1405, 1407 n. 2 (11th Cir. 1998) (Supreme court "squarely rejected" the doctrine of hypothetical jurisdiction). Compare Hardemon v. City of Boston, 144 F.3d 24, 26 (1st Cir. 1998) ("The various opinions in the case, read as a whole, are not entirely clear as to whether (or to what extent) Steel Co. undermines our earlier practice [of assuming jurisdiction]. In all events, having noted the red flag, we see no need in this case to test the outer limits of the Court's tolerance, and, thus, we turn to the jurisdictional issue."), with id. at 30 (Bownes, J., concurring) ("Reading the majority and concurring opinions in Steel Co. together, there is a Supreme Court majority in support of the general rule that 'federal courts should be certain of their jurisdiction before reaching the merits of a case.'"). Although the final tally of the justices' votes may not be clear, our en anc opinion in Ruhrgas compels us to recognize Justice Scalia's Steel Co. opinion as authoritative.

16

approach is flawed, for "[o]n every writ of error or appeal, the first and fundamental question is that of jurisdiction . . ." Steel Co., 118 S.Ct. at 1012 (quoting Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900)). Furthermore,

> [w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.

Ex parte McCardle, 7 Wall. 506, 514, 19 L.Ed. 264 (1868); Steel Co., 118 S.Ct. at 1016 ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.").[12]

Accordingly, if the Eleventh Amendment removes our jurisdictional authority to hear Foulds's case, we have no power to determine whether the False Claims Act creates a cause of

---

[12]No one has challenged Foulds's standing in this case. We must, however, consider possible objections to standing sua sponte. Lang v. French, 154 F.3d 217, 222 (5th Cir. 1998). Our court has explicitly found that qui tam plaintiffs have standing. United States ex rel. Weinberger v. Equifax, Inc., 557 F.2d 456, 460 (5th Cir. 1977). As noted in a district court opinion concluding that relators lack standing, since our opinion in Equifax, the Supreme Court has refined its standing jurisprudence. United States ex rel. Riley v. St. Luke's Episcopal Hosp., 982 F. Supp. 1261 (S.D. Tex. 1997). Yet, with regard to this issue, we consider persuasive a recent Supreme Court decision dealing with a qui tam issue under the False Claims Act. See Hughes Aircraft Co. v. United States ex rel. Schumer, 117 S.Ct. 1871 (1997) (holding that portions of the 1986 amendments to the Act do not apply retroactively). The Hughes Aircraft Court did not raise any standing objections.

17

action against states--i.e., whether states are "person[s]" under the Act. See Blatchford v. Native Village of Noatak, 501 U.S. 775, 788 n.5 (1991) ("Because we find that § 1362 does not enable tribes to overcome Alaska's sovereign immunity, we express no view on whether these respondents qualify as "tribes" within the meaning of that statute."). Even though our reading of "person" might foreclose any possibility of a private citizen bringing a FCA qui tam action against the state of Texas, this possible result does not convert the statutory issue into a jurisdictional one. A determination that the relevant statute creates no cause of action under which the plaintiff may proceed says nothing about a court's subject-matter jurisdiction over the suit. Steel Co., 118 S.Ct. at 1010 ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case.").

                                    B

                                    1

     We now attend to the threshold jurisdictional issue: whether a private citizen may institute a suit--on behalf of the United States--against a state in federal court. The facts of this case necessarily limit our inquiry to the situation in which a private citizen brings the qui tam action and the United States

18

government has not intervened.[13]  We review Eleventh Amendment

immunity determinations, like other questions of subject matter

jurisdiction, de novo as a question of law.  Ussery v. Louisiana,

150 F.3d 431, 434 (5th Cir. 1998).

As a matter of helpful repetition, we again set out the text

of the Eleventh Amendment:

> The Judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. Const. amend. XI (emphasis added).  The Supreme Court has

interpreted this amendment to bar citizens from suing their own

states as well as other states.  Hans v. Louisiana, 134 U.S. 1

(1890).  We must therefore apply the seemingly plain proposition

---

[13]Although we express no opinion as to whether the government's presence as intervenor would change the Eleventh Amendment analysis, we do note that at least one Supreme Court case may be relevant to that question.  In an original action before the Supreme Court involving a dispute between two states over water rights of the Colorado River, the Court allowed Indian Tribes to intervene after the United States had actively intervened in the case.  Arizona v. California, 460 U.S. 605, 613-14 (1983).  In concluding that the Eleventh Amendment did not bar this intervention, the Supreme Court stated:

> The Tribes do not seek to bring new claims or issues
> against the states, but only ask leave to participate in
> an adjudication of their vital water rights that was
> commenced by the United States.  Therefore, our judicial
> power over the controversy is not enlarged by granting
> leave to intervene, and the States' sovereign immunity
> protected by the Eleventh Amendment is not compromised.

Id. (emphasis added).

of the Eleventh Amendment to the arguments advanced by Foulds and the United States that this case was not "commenced or prosecuted" by a citizen, but instead by the United States itself.  In actuality, it is as plain as the sun that this suit was not commenced by the United States and that the United States has not intervened to prosecute the case.  It is true however, that Foulds, pursuant to statutory authority, has brought this suit in the name of and on behalf of the United States to recover damages for it for injuries it has suffered.  Thus, although it is clear--to track the language of the Eleventh Amendment--that Foulds is a citizen who has commenced a suit against Texas, we cannot conclude our inquiry so abruptly.  We must explore the more subtle question:  Has Foulds, in her capacity as a <u>private citizen</u>, commenced or prosecuted a suit against the state of Texas?[14]

By first asking who has commenced or prosecuted the suit against Texas, our starting point differs from that of the four other circuit courts that have addressed this issue.  Those

---

[14]The Eleventh Amendment cloaks Texas Tech University and Texas Tech University Health Sciences Center with sovereign immunity as state institutions.  <u>See</u> <u>Wallace v. Texas Tech Univ.</u>, 30 F.3d 1042, 1047 n.3 (5th Cir. 1996) (citing <u>Henry v. Texas Tech Univ.</u>, 466 F.Supp. 141, 144-46 (N.D. Tex. 1979) (Texas Tech University and Texas Tech University School of Medicine both enjoy sovereign immunity)).  As the district court noted, the Texas legislature has changed the name of Texas Tech University School of Medicine to Texas Tech University Health Sciences Center.  <u>Foulds</u>, 980 F. Supp. at 870 n.4.

courts began their analyses by first determining that the United States is the "real party in interest" in qui tam actions.  Then, they conclude that because the states enjoy no sovereign immunity from the United States,[15] the Eleventh Amendment does not apply. United States ex rel. Rodgers v. Arkansas, 154 F.3d 865, 868 (8th Cir. 1998); United States ex rel. Stevens v. Vermont Agency of Natural Resources, 162 F.3d 195, 201-03 (2d Cir. 1998); United States ex rel. Fine v. Chevron, U.S.A., Inc., 39 F.3d 957, 963 (9th Cir. 1994), vacated, 72 F.3d 740 (9th Cir. 1995); Milam, 961 F.2d at 50.  But these decisions provide no reasons or authority for equating a[16] real party in interest with the party who "commences or prosecutes" the suit.  Deciding whether it is Foulds or the United States that has commenced this suit requires, we believe, a harder look than simply recognizing that the United States is a real party in interest.

---

[15]United States v. Texas, 143 U.S. 621, 646 (1892) (Texas consented to suit by the United States when admitted into the Union).

[16]Our own circuit's precedent describes the United States as "a" real party in interest rather than "the" real party in interest.  Searcy v. Philips Electronics North America Corp., 117 F.3d 154, 156 (5th Cir. 1997) (case involving qui tam suit against a private corporation).  In contrast, the Second, Fourth, Eighth and Ninth Circuits all use the definite article.  But see Stevens, 162 F.3d at 221 (Weinstein, J., dissenting) ("it is apparent that the United States is not the only real party in interest in this case").  As we shall see, our use of the indefinite, rather than the definite, article has relevant consequences in deciding which party "commences and prosecutes" the suit within the meaning of the Eleventh Amendment.

21

The question allows no easy answer.  One reason for the perplexity is that Congress has not, in this respect, specified the contours of the relationship between the qui tam plaintiff and the United States.  At one end of the spectrum, the United States could simply assign the cause of action to the qui tam plaintiff, yielding complete control and ownership of the suit.  Compare United States ex rel. Kelly v. The Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993) ("We conclude that Congress intended to assign the government's fraud claims to individual qui tam plaintiffs in cases where the government itself chooses not to pursue such claims."); with Louisiana Dept. of Transp. and Dev. v. PNL Asset Management Co. (In re Estate of Fernandez), 123 F.3d 241, 245-46 (5th Cir.)  (private party cannot escape sovereign immunity defense when United States agency sold that party the judgment forming the basis of a bankruptcy adversarial proceeding), modified, 130 F.3d 1138 (5th Cir. 1997) ("Fernandez").  At the other end of the spectrum, the United States could formally deputize each individual qui tam plaintiff so that the relator remains under the full control of, and acts first and foremost in the interests of, the United States.  Cf. Milam, 961 F.2d at 49 ("Congress has let loose a posse of ad hoc deputies . . .").

Contrary to language in the cases just cited, neither of those two concepts--at the respective ends of our spectrum--

22

accurately describes the relationship:[17]  The government retains

some control over the qui tam suit commenced by the plaintiff,

see, e.g., 31 U.S.C. § 3730(c)(3) (United States may intervene

upon showing of good cause), but does not exercise authoritative

control over the case, see, e.g., id. § 3730(c)(1) (relator has

the right to remain a party to the suit even if the government

intervenes).  The government retains some possessory rights to

the proceeds of the suit, see id. § 3730(d)(2) (fixing the

relator's maximum share of proceeds at thirty percent) , but

cannot claim rights to all of the proceeds, see id. § 3730(d)

(establishing relator's minimum percentage share of the

proceeds).  The FCA does expressly assign some authority to

institute suits in the name of the government, see id. § 3730(b)

("A person may bring a civil action for a violation of section

3729 for the person and for the United States Government.  The

action shall be brought in the name of the Government."), but the

government does not expect that the relator will act first and

foremost with the government's interests in mind, see e.g.,

United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing

Corp., 151 F.3d 1139 (9th Cir. 1998) (discussing government's

effort to end industry war by intervening in over twenty FCA

---

[17]See generally Valerie R. Park, Note, The False Claims Act, Qui Tam Relators, and the Government: Which is the Real Party to the Action?, 43 Stan. L. Rev. 1061 (1991).

23

suits between competing citrus companies).[18]  However we may

describe and weigh the respective roles of the government and the

qui tam plaintiff under the False Claims Act, we still must

decide whether it can be said that this suit was commenced or

_____

[18]The Second Circuit has indicated that the interests of a qui tam plaintiff are akin to the interests of an attorney working for a contingent fee.  Stevens, 162 F.3d at 202.  We think this analogy, while conceptually clear, is flawed because of important distinctions between the roles of a qui tam plaintiff and a contingent fee lawyer.  For example, an attorney owes important fiduciary duties to his client that the qui tam plaintiff does not owe to the United States.  No legal duty prevents the qui tam plaintiff from furthering his own interests to the detriment of the United States' interests.  Cf. United States ex rel. Killingsworth v. Northrop Corp., 25 F.3d 715, 718 (9th Cir. 1994) (qui tam case in which "[t]he government thought that the parties might have specifically structured the settlement so as to reduce the amount the government realized" by placing the bulk of the settlement amount into a wrongful termination claim instead of the FCA claim); United States ex rel. Mathews v. Bank of Farmington, No. 98-2040, 1999 WL 25680, at *4 (7th Cir. Jan. 20, 1999) (noting that the FCA would not prevent some types of "troubling" and opportunistic claims); Searcy v. Philips Electronics North America Corp., 117 F.3d 154, 160 (5th Cir. 1997) (noting that relators can manipulate settlements of qui tam litigation in ways that "unfairly enrich them and reduce benefits to the government," but then holding that the Attorney General always retains the right to object to these settlements); Stevens, 162 F.3d at 225-29 (Weinstein, J., dissenting) (arguing, on an abstract level, that qui tam plaintiffs bringing suits against states can undermine federal interests by thwarting the healthy process whereby federal representatives, federal administrators, and state administrators work together to coordinate the administration of programs involving the federal and state governments).  Furthermore, the Supreme Court has found that a different analogy applies:  Qui tam methods of prosecution "compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel." Hughes Aircraft, 117 S.Ct. at 1877 (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 541, n.5 (1943) (quoting United States v. Griswold, 24 F. 361, 366 (D. Or. 1885)).

24

prosecuted by the United States for Eleventh Amendment purposes.

2

Preliminarily, we note that even though the United States may be a relevant "party" in this suit for some purposes of the litigation, the Federal Government certainly is not the acting party-of-record in this suit. Our court's precedent commands this view. In <u>Searcy v. Philips Electronics North America Corp.</u>, 117 F.3d 154, 156 (5th Cir. 1997), we faced the question whether the United States could appeal a district court's settlement approval when the government had not yet intervened in the qui tam action. We found that the United States--although <u>a</u> real party in interest--was not a party for purposes of appeal.[19] <u>Id.</u> at 156. We based this conclusion on our view that the FCA's

> structure distinguishes between cases in which the United States is an active participant and cases in which the United States is a <u>passive beneficiary</u> of the relator's efforts. [Thus,] when the government chooses to remain passive, as it [had in <u>Searcy</u>], we [saw] no reason to treat it as a party with standing to challenge the district court's action as of right.

<u>Id.</u> at 156 (emphasis added); <u>see also</u> <u>Avco Corp. v. United States Dept. of Justice</u>, 884 F.2d 621, 623-24 (D.C. Cir. 1989) (interpreting the word "commences," as used in the FCA, so that the relator's act of commencing an action does not equate to the

---

[19]We went on to conclude, however, that the United States could appeal the district court's order as a proper non-party appellant. <u>Searcy</u>, 117 F.3d at 157-58.

25

Attorney General commencing an action).  Just as in <u>Searcy</u>, the United States has chosen to remain inactive in the prosecution of this case.  Where the United States has opted for this passive role, it is difficult to treat it as the party that has "commenced or prosecuted" the suit.  <u>Cf.</u> 31 U.S.C.A. § 3730(b)(4)(B) (giving the relator "the right to conduct the action" when the government declines to assume control); <u>Searcy</u>, 117 F.3d at 160 ("A relator has 'conducted' an action if he devises strategy, executes discovery, and argues the case in court . . .").  To say the least, a "passive party" is certainly a contradictory description for a party who "commences" or "prosecutes" the suit.[20]

---

[20]Our early legislators adopted the qui tam concept from the English system.  <u>See</u> Note, <u>The History and Development of Qui Tam</u>, 1972 Wash. U. L.Q. 81.  Thus, it is significant that in his description of qui tam actions, William Blackstone indicated that either the king <u>or</u> the relator could "commence" a quit tam action:

> Sometimes one part [of the proceeds from suit] is given to the king, to the poor, or to some public use, and the other part to the informer or <u>prosecutor</u>; and then the suit is called a *qui tam* action, because <u>it is brought</u> by a person "*qui tam pro domino rege quam pro se imposo sequitur.*"  If the king therefore <u>himself commences</u> this suit, he shall have the whole forfeiture.

3 William Blackstone, <u>Commentaries</u> *160.  Blackstone penned this passage less than thirty years before ratification of the Eleventh Amendment.

The only argument raised to challenge the facial assumption that Foulds actually "commenced and prosecuted" this action as a private citizen is that the FCA establishes Foulds as the deputy of the United States.[21] The Supreme Court has made clear, however, that Congress cannot delegate to private citizens the United States' sovereign exemption from Eleventh Amendment restrictions.

In Blatchford, the Court held that the Eleventh Amendment bars federal court suits by Indian tribes against a state.

_____

[21]A critical issue related to this "deputization" argument, however, is whether the United States Congress can assign the power of the United States as a sovereign to sue another sovereign. Aside from the Eleventh Amendment issue, we note our concern as to whether Congress can, consistent with the Constitution, deputize private parties to act on behalf of the Executive Branch. See United States ex rel. Stevens v. Vermont Agency of Natural Resources, 162 F.3d 195, 220 (2d Cir. 1998) (Weinstein, J., dissenting) (discussing why "the FCA's qui tam procedures may violate the Appointments Clause of Article II of the Constitution, and may interfere with the President's explicitly stated constitutional duty to take care that the laws be faithfully executed"). Because we ultimately find that the federal courts have no jurisdiction over this suit, we do not (and, indeed, cannot) express any opinion on this non-jurisdictional issue. We do, however, note that the Department of Justice has indicated agreement with a memorandum published by the Office of Legal Counsel. See Memorandum for the General Counsels of the Federal Government, The Constitutional Separation of Powers Between the President and Congress, 1996 WL 876050 (O.L.C.) (Preliminary Print) (May 7, 1996). The Office of Legal Counsel states agreement with the view that "because qui tam plaintiffs are not officers of the United States, the FCA does not violate the Appointments Clause." Id. at *15 n. 66 (quoting United States ex rel. Burch v. Piqua Engineering, Inc., 803 F. Supp. 115, 120 (S.D. Ohio 1992).

Blatchford, 501 U.S. at 782.  The tribes argued that the United

States had delegated to the tribes its authority to bypass the

Eleventh Amendment and to thus sue the states in federal courts.

The tribes first pointed out that the Supreme Court had

previously recognized the authority of the United States to bring

claims against states to enforce rights of Indian tribes.  Id. at

783.  Next, the tribes argued that a jurisdictional statute, 28

U.S.C. § 1362,[22] delegated to Indian tribes the United States'

power to press their claims notwithstanding the states' Eleventh

Amendment sovereign immunity.  Blatchford, 501 U.S. at 783.[23]

Because the Eleventh Amendment does not bar the United States

from suing the states in federal court, the tribes argued, it

also does not bar delegates of the United States (pursuant to §

1362) from commencing an action in the federal courts.  The

Supreme Court rejected this argument:

---

[22]Section 1362 states:

The district courts shall have original jurisdiction of
all civil actions, brought by any Indian tribe or band
with a governing body duly recognized by the Secretary
of the Interior, wherein the matter in controversy
arises under the Constitution, laws, or treaties of the
United States.

28 U.S.C. § 1362 (1994).

[23]The argument did not assert that Congress abrogated the
states' sovereign immunity in § 1362.  Blatchford, 501 U.S. at
785.  Rather, the tribes argued that the statute, like the FCA
qui tam statute, simply allowed Indian tribes to litigate suits
that the United States could have brought.  Id.

> We doubt . . . that the sovereign exemption can be delegated . . . The consent "inherent in the convention," to suit by the United States--at the instance and under the control of responsible federal officers--is not consent to suit by anyone whom the United States might select . . .

Id. at 785. See also The Federalist No. 81, at 455 (Alexander Hamilton) (Isaac Kramnick ed., 1987) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. . . . Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States . . . ."); Stevens, 162 F.3d at 224 (Weinstein, J., dissenting) (stating that the federal government's power to sue a state in federal court is nontransferable); Rodgers, 154 F.3d at 869 (Panner, J., dissenting) (same). To be sure, our circuit has been explicit that "there must be a clear expression of purpose to abrogate the Eleventh Amendment in any extension of agency status to a private party for the purpose of jurisdiction." Fernandez, 130 F.3d at 1139. The FCA contains no such clear expression.

As the Supreme Court has suggested in Blatchford, the principle of federalism embodied in both the Constitution and the Eleventh Amendment reflects an understanding between two sovereign authorities--the Federal Government and the respective states-- that state sovereignty is surrendered only to another sovereign, the United States, which, of course, acts through

29

"responsible federal officers."  Qui tam plaintiffs cannot

qualify as surrogates of "responsible federal officers" who have

the right to represent the sovereign to sue the respective

states.  Indeed, the Supreme Court has recognized this fact.  In

a recent case, it stated that "[a]s a class of plaintiffs, qui

tam relators are different in kind than the Government.  They are

motivated primarily by prospects of monetary reward rather than

the public good."  Hughes Aircraft Co. v. United States ex rel.

Schumer, 117 S.Ct. 1871, 1877 (1997) (unanimous opinion)

(emphasis added).  Importantly, the Supreme Court specifically

noted "[t]hat [just because] a quit tam suit is brought by a

private party 'on behalf of the United States,' does not alter

the fact that a relator's interests and the Government's do not

necessarily coincide."  Id. at 1877 n.5.  This realistic

portrayal of qui tam plaintiffs comports with the rationale

behind the FCA provisions as articulated by Senator Howard, the

sponsor of the original bill preceding the FCA:

> I have based the enforcement provisions upon the old-
> fashioned idea of holding out a temptation, and
> "setting a rogue to catch a rogue," which is the safest
> and most expeditious way I have ever discovered of
> bringing rogues to justice.

Cong. Globe, 37th Cong., 3d Sess. 955-56 (1863).  Furthermore,

Sir Edward Coke's class description of qui tam plaintiffs hardly

suggests a historical understanding of relators as responsible

30

representatives of the sovereign.  He described the common informers who institute penal actions for the government as "viperous vermin" that prevent "[t]he King [from] commit[ting] the sword of his justice or the oil of his mercy."  Gerald Hurst, The Common Informer, 147 Contemp. Rev. 189-90 (1935).  In short, these descriptions of the historical qui tam plaintiff undermine the concept that she is deputized to stand in for the "responsible federal officers" to whom the states have surrendered their sovereign rights.

Furthermore, rogue or not, the qui tam plaintiff is surely no mere opportunistic bystander in the litigation, irrespective of whose name the litigation may bear.  With the merely chimerical presence of the United States in this case, the relator's significant control over the litigation process plainly impinges on state sovereignty.  It is Foulds--not the United States as sovereign--who controls all strategic litigation decisions in the case such as how, when and in what manner to make demands on a state, whether to sue a state, how far to push the state toward a jury trial in extended litigation, whether to settle with a state and on what terms, etc.; and it is Foulds who maintains sole responsibility for financing the litigation and for its costs.  See 31 U.S.C. § 3730(f) ("The Government is not liable for expenses which a person incurs in bringing an action under this section.").  The fact that the government has not a

31

penny staked in this case plays an important role in determining which party has commenced and prosecuted the suit for Eleventh Amendment purposes. See New Hampshire v. Louisiana, 108 U.S. 76, 89 (1883) (where private citizens funded the litigation, Eleventh Amendment barred suit brought in the name of a state, on behalf of those private citizens, against another State). Unless the United States commits its own resources--both personnel and money that are under its authority and control--private citizens should not be able to sidestep the Eleventh Amendment and hail the sovereign states into federal court.[24]

4

In sum, we hold that when the United States has not actively intervened in the action, the Eleventh Amendment bars qui tam plaintiffs from instituting suits against the sovereign states in federal court. The United States' decision to maintain a passive role compels us to conclude that the private citizen, not the

---

[24]Of course, citizens may, generally, pursue prospective injunctive relief against state officials. See Edelman v. Jordan, 415 U.S. 651, 664 (1974) (recognizing the Eleventh Amendment distinction between retrospective and prospective relief). Foulds seeks only retrospective relief under the FCA. In her original complaint, however, Foulds also requested an order directing the defendants to "cease and desist from violating 31 U.S.C. § 3729." The FCA does not provide for this prospective relief. Since the qui tam plaintiff's standing is supported only by the FCA's qui tam provision, courts must deny any such requests. Cf. Equifax, 557 F.2d at 459-60 (qui tam plaintiff has no standing to seek declaratory judgment against defendant).

32

United States, has "commenced or prosecuted" the suit.
Furthermore, the United States cannot delegate to non-designated,
private individuals its sovereign ability to evade the
prohibitions of the Eleventh Amendment.  Only "responsible
federal officers," or those who act at their instance and under
their control, may exercise the authority of the United States as
sovereign.  Foulds  does not qualify.

C

Having decided that a private citizen has commenced and
prosecuted this action against a sovereign state within the
meaning of the Eleventh Amendment's proscription, our remaining
task is to apply the dictates of Seminole Tribe:

> In order to determine whether Congress has abrogated
> the States' sovereign immunity, we ask two questions:
> first, whether Congress has "unequivocally expresse[d]
> its intent to abrogate the immunity," and second,
> whether Congress has acted "pursuant to a valid
> exercise of power."

Seminole Tribe, 517 U.S. at 55 (citations omitted).

In Scott v. University of Mississippi, 148 F.3d 493 (5th
Cir. 1998), we stated the requirements for finding Congressional
intent to abrogate the States' sovereign immunity:

> Congress's intent to abrogate state sovereign immunity
> "must be obvious from 'a clear legislative statement.'"
> Congress may abrogate state sovereign immunity "only by
> making its intention unmistakably clear in the language
> of the statute."  A general authorization for suit in
> federal court is not the kind of unequivocal statutory
> language sufficient to abrogate the Eleventh
> Amendment."  Instead, both the text and structure of

33

the statute must "make[] it clear that the State is the [intended] defendant in the suit."  Congress is not required, however, to "explicitly reference to state sovereign immunity or the Eleventh Amendment."

Id., 148 F.3d at 499 (citations omitted).

Foulds has not argued that the FCA "unequivocally expresse[s]" a congressional intent to abrogate the states' sovereign immunity.  Neither have we found any such clear intent, as no relevant provision of the Act explicitly mentions states as defendants.  Cf. Seminole Tribe, 517 U.S. at 57 ("[W]e think that the numerous references to the 'State' in the text of § 2710(d)(7)(B) make it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit.").  We need not proceed any further than this.  The Eleventh Amendment bars Foulds's § 3729  claim against the Texas defendants.

D

We must next consider the Eleventh Amendment implications for Foulds's § 3730(h) anti-retaliation claim.[25]  We conclude

---

[25]Section 3730(h) states:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make

34

that she has "commenced or prosecuted", within the meaning of the

Eleventh Amendment, a suit against the Texas defendants for this

alleged violation of § 3730(h).  Consequently, this claim must be

dismissed as well.

Foulds's argument that the United States is also a real

party in interest in a § 3730(h) claim is, it seems to us, far

more of a stretch than the claim we have just dismissed.  The

only support she offers for this argument is that the United

States has an interest in protecting those who prosecute actions

on the United States' behalf.  (The United States, which has

argued alongside Foulds for purposes of this appeal, leaves her

on her own when she makes this argument.)  Even if we assume that

the claim was not dependent upon her ability to prosecute this

case, there are significant independent reasons that lead to our

rejection of this claim.  The qui tam plaintiff keeps all of the

proceeds from any successful § 3730(h) claim; indeed, only a qui

tam plaintiff possesses the right to bring such a claim.

---

the employee whole.  Such relief shall include reinstatement
with the same seniority status such employee would have had
but for the discrimination, 2 times the amount of back pay,
interest on the back pay, and compensation for any special
damages sustained as a result of the discrimination,
including litigation costs and reasonable attorneys' fees.
An employee may bring an action in the appropriate district
court of the United States for the relief provided in this
subsection.

31 U.S.C.A. § 3730(h) (West Supp. 1998).

Therefore, even if we accepted a "real party in interest" analysis for determining whether the Eleventh Amendment applies in this case, Foulds's § 3730(h) claim nevertheless would be barred.  See Bankston v. Burch, 27 F.3d 164, 167 (5th Cir. 1994) (party possessing the right sought to be enforced is the real party in interest).  Any collateral interest the United States might have in protecting qui tam plaintiffs simply cannot trump the Eleventh Amendment.[26]

IV

For all of the foregoing reasons, we REVERSE the district court's order denying the Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction over the suit, and we REMAND for an entry of a judgment dismissing the complaint as to Texas Tech University and Texas Tech University Health Sciences Center.

REVERSED and REMANDED for Entry of
Judgment Dismissing Appellants.

Judge Benavides concurs in result.

---

[26]With respect to § 3730(h), Foulds has only requested retrospective, monetary relief.

36