IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-40515

_____

JASON R. SEARCY, Trustee for the Bankruptcy
Estate of C&P Business World, Inc.; ET AL,

                                        Plaintiff,

versus

PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION; ET AL,

                                        Defendant.

_____

LLOYD T. BORTNER, on behalf of the
United States of America,

                                        Plaintiff-Appellee,

versus

PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION; ET AL,

                                        Defendants,

PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS NV,

                                        Defendants-Appellees,

versus

UNITED STATES OF AMERICA,

                                        Appellant.

_____

Appeal from the United States District Court
For the Eastern District of Texas, Beaumont

_____

June 30, 1997
(                              )

Before REYNALDO G. GARZA, HIGGINBOTHAM, and JONES, Circuit Judges.


PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we must decide whether the False Claims Act gives the government the power to veto a settlement after it has declined to intervene in both the trial and appellate courts. We find the last sentence of 31 U.S.C. § 3730(b)(1) unambiguous in its declaration that courts may not grant a voluntary dismissal in a False Claims Act suit unless the U.S. Attorney General consents to the dismissal. Thus, we must vacate the settlement order and voluntary dismissal and remand to the district court.

I.

According to the complaint, Philips Electronics North America Corp. and Philips Electronics illegally concealed from the U.S. government a 1985 executive decision to withdraw from the U.S. market and to abandon their local U.S. dealers. The U.S. government relied on Philips's continuing presence in the U.S. market when it bought and leased automation equipment worth millions of dollars. Lloyd T. Bortner, Jr., learned of Philips's allegedly deceptive policy when he was serving as a manager for a Philips division called Philips Information Systems Co. He brought a suit on behalf of the government under the False Claims Act, which prohibits "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The district court eventually consolidated Bortner's qui tam action with a private suit against Philips brought by five former Philips dealers.

As required by 31 U.S.C. § 3730(b)(2), Bortner served the Attorney General with the complaint and evidence under seal so that the government could decide whether to take over the action. In keeping with § 3730(b)(3), after 60 days the government moved for and received a 90-day extension of time in which to investigate Bortner's allegations. When it asked for a second 90-day extension, however, the court denied its request. On January 26, 1995, the government decided not to exercise its right to intervene. The court unsealed the documents so that Bortner could prosecute the action. The government reminded Bortner's counsel as a matter of course that it was not a party and that discovery of government documents would have to proceed by subpoena under Fed. R. Civ. P. 45.

During nearly a year of discovery, Bortner forwarded court documents to the government. Bortner and Philips made two unsuccessful, court-ordered efforts at mediation. After three days of trial, on February 1, 1996, they reached a settlement in which the court would enter a judgment of $1 million dollars against Philips. Pursuant to § 3730(d)(2), Bortner would get 30% of the award, in addition to $300,000 in attorneys' fees.

The government, however, objected to the settlement. Because it had investigated only the claims that Bortner actually brought, it protested a release from "all claims and counterclaims asserted in any pleading or other filing in this action, or which could have been asserted by the parties in this action, arising out of the transactions and occurrences that are the subject matter of this

3

action."  The government was unsuccessful in its efforts to convince Philips to accept a release only from claims actually stated in the final complaint.  In an objection filed with the court and at a show-cause hearing, the government asserted that § 3730(b)(1) gives it the power to veto the settlement.  It did not, however, request to intervene for good cause under § 3730(c)(3).  The district court overruled the objection and approved the settlement.  One week later, Philips paid the government $700,000.  The government filed a notice of appeal, again without moving to intervene.

## II.

Regardless of whether the government opts to control or intervene in a case, the False Claims Act requires that actions "be brought in the name of the Government."  31 U.S.C. § 3730(b)(1). Under the statutory structure, relators such as Bortner sue both "for the person and for the United States Government."  Id.  Thus, as Bortner seems to concede, the United States is a real party in interest even if it does not control the False Claims Act suit. See United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center, 961 F.2d 46, 48-49 (4th Cir. 1992).

The government draws the further conclusion that it is automatically a party for purposes of appeal.  At least one court interpreting the Act as amended in 1986 has taken this position where the question was whether the appellant should get the benefit of Fed. R. App. P. 4(a)(1)'s special 60-day period for filing a notice of appeal in a suit in which the United States is a party.

4

See United States ex rel. Haycock v. Hughes Aircraft Co., 98 F.3d 1100, 1102 (9th Cir. 1996) ("[T]he government's nominal party status combined with the majority financial interest in the outcome suffices to make it a party for purposes of the sixty day notice of appeal rule."), cert. denied, ___ U.S. ___, 117 S. Ct. 1693 (1997). According to the Ninth Circuit, litigants who are unsuccessful in the district court should not be penalized for reading Rule 4(a)(1) in light of the statute's purpose of vindicating the interests of the United States. Cf. United States ex rel. Petrofsky v. Van Cott, Bagley, 588 F.2d 1327, 1329 (10th Cir. 1978) (holding that, under the pre-1986 version of the Act, the government is not a party for the purposes of Rule 4(a)(1) because its interest ends once it decides not to prosecute the action itself), cert. denied, 444 U.S. 839 (1979).

But viewing the government as a party for the purposes of Rule 4(a)(1) does not compel us to treat it as a party for all appellate purposes. The Act forces the government to decide at the outset whether it wants to become an active litigant or to let the relator represent its interests. 31 U.S.C. § 3730(b)(2). It further allows the government to intervene at any time on a showing of good cause. 31 U.S.C. § 3730(c)(3). In short, its structure distinguishes between cases in which the United States is an active participant and cases in which the United States is a passive beneficiary of the relator's efforts. When the government chooses to remain passive, as it has here, we see no reason to treat it as

5

a party with standing to challenge the district court's action as of right.

Bortner argues that non-parties simply cannot appeal, and thus that the government cannot prosecute an appeal without first intervening. Read out of context, a few cases seem to announce such a rule. See, e.g., Marino v. Ortiz, 108 S. Ct. 586, 587 (1988) (per curiam) ("[B]ecause petitioners were not parties to the underlying lawsuit, and because they failed to intervene for purposes of appeal, they may not appeal from the consent decree approving that lawsuit's settlement . . . ."); Edwards v. City of Houston, 78 F.3d 983, 993 (5th Cir. 1996) (en banc) ("It is well-settled that one who is not a party to a lawsuit, or has not properly become a party, has no right to appeal a judgment entered in that suit." (citing Marino)).

We have enforced the rule with respect to nonnamed members of class actions. See Flanagan v. Ahearn, 90 F.3d 963, 990 (5th Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3611 (U.S. Feb. 27, 1997); Walker v. City of Mesquite, 858 F.2d 1071, 1074 (5th Cir. 1988) ("[T]he better practice . . . is for nonnamed class members to file a motion to intervene and then, upon the denial of that motion, appeal to this Court." (citing Marino)). But the structure of class actions differs from the structure of qui tam actions. As the Walker court noted, allowing nonnamed class members to appeal a final judgment could frustrate the Rule 23 mechanism by making class actions unwieldy and less productive. 858 F.2d at 1074. Class actions involve many unnamed class members, and giving each

6

a right to appeal could result in a confusing and unmanageable appellate process.  Furthermore, a nonnamed class member can protect his interest by mounting a collateral attack.  Litigation conducted en masse presents different problems and calls for different rules than litigation conducted on behalf of a single entity such as the United States government.

Outside of the class-action context, the rule on non-party appeals is not as rigid as Bortner and Philips contend.  Although we dismissed a would-be non-party appellant in EEOC v. Louisiana Office of Community Services, 47 F.3d 1438, 1442-43 (5th Cir. 1995), we inquired whether "the non-parties actually participated in the proceedings below, the equities weigh in favor of hearing the appeal, and the non-parties have a personal stake in the outcome."  See also United States v. Chagra, 701 F.2d 354, 358-60 (5th Cir. 1983) (allowing non-party reporters to appeal an order closing a courtroom to the media in the wake of the assassination of a federal judge).  Professors Wright and Miller devote a long section of their treatise to the topic and encapsulate the law by stating that "[a]ppeal is likely to be available . . . if the would-be appellant can show significant involvement with the judgment, plausible reasons for not becoming involved earlier, a risk that its interests will not be adequately protected by the parties, and a lack of untoward interference in the affairs of the parties."  15A Federal Practice and Procedure 2d § 3902.1, at 102 (1992).

We find that the Louisiana Office of Community Services test provides the appropriate standard here. The government has satisfied all three prongs of that test. First, it participated in the district court proceedings by investigating and monitoring the case and by arguing against the settlement at a hearing.

Second, the equities favor the government because it is relying on a good-faith argument that Congress has instructed the courts — including the courts of appeals — not to approve settlements when the government doesn't consent. Bortner condemns the government for failing to take advantage of the Act's provision that "the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause." 31 U.S.C. § 3730(c)(3). Our question is not, however, whether the government was prudent given the uncertainty about its rights under the Act. Our question is whether Congress has given to the government the right to block settlements even if it is not a formal party to the district court or circuit court proceedings. As we will explain, we agree with the government that the False Claims Act grants it the power to withhold consent to voluntary settlements. In light of this governmental right, it would be odd to preclude appellate remedies based on the government's failure to intervene. If, as we conclude, the district court was mistaken in determining that the government has no veto power, the government should be able to correct that error by raising its veto power in an appeal to this court, even if it chooses not to intervene.

8

Bortner also argues that the government lacks standing and thus fails the third prong, which requires a personal stake in the outcome. We disagree. Although Bortner supposes that the settlement binds only Bortner and Philips, the language in the district court's order approving the settlement may not be so narrow. The settlement stretches to "all claims and counterclaims asserted in any pleading or other filing in this action, or which could have been asserted by the parties in this action, arising out of the transactions and occurrences that are the subject matter of this action." By binding "the parties in this action," the order could be interpreted to include the government for claim-preclusion purposes. See Valerie R. Park, Note, The False Claims Act, *Qui Tam* Relators, and the Government: Which Is the Real Party to the Action?, 43 STAN. L. REV. 1061, 1084-87 (1991) (arguing that because the government has an opportunity to investigate and control False Claims Act suits, it should be subject to claim preclusion when a relator prosecutes a False Claims Act action on its behalf). Cf. Westerchil Constr. Co. v. United States, 16 Cl. Ct. 727, 732 (1989) (refusing to give a Miller Act suit preclusive effect against the government because the Miller Act does not give the United States any "participatory or supervisory authority"). We are unsure why Philips would resist a settlement with more modest preclusive language unless it hoped to buy peace from future suits by the United States or relators based on the same transactions. Indeed, Philips asserts in its brief that if this case had been decided by the jury, future claims by the United States would be barred to the

9

same extent as claims by Bortner himself.  We do not have occasion to decide what sorts of claims the Bortner-Philips settlement might preclude.  It is enough to determine that the government has a stake in the outcome because of a legitimate concern that giving Philips the benefits of full claim preclusion could prevent prosecutions not only under the False Claims Act, but also under other statutes.

In sum, the unique structure of the False Claims Act gives the government an adequate level of participation in the district court proceedings, a good-faith reliance on a statutory right, and a concrete stake in the outcome.  Thus, the government's appeal is properly before us even though the government is not a party that ordinarily could challenge as of right the district court's final order.

III.

The government asks us to sanction an absolute veto power over voluntary settlements in qui tam False Claims Act suits.  The statutory language appears to grant just that: "The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."  31 U.S.C. § 3730(b)(1).

Most cases have only flirted with the issue.  In Minotti v. Lensink, 895 F.2d 100, 104 (2d Cir. 1990), the court remarked that "[o]nce the United States formally has declined to intervene in an action . . . , little rationale remains for requiring consent of the Attorney General before an action may be dismissed."  But that

case involved an involuntary dismissal for the relator's failure to comply with the defendants' discovery requests.  In spite of its dicta, the Minotti court held that "the provision requiring consent of the Attorney General prior to dismissal of a private action . . . continues to apply only where the plaintiff seeks voluntary dismissal of the action."  Id. at 103.  Accord United States ex rel. Fletcher v. Fahey, 121 F.2d 28, 29 (D.C. Cir.), cert. denied, 314 U.S. 624 (1941); United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine, 855 F. Supp. 419, 423 (D. Me. 1993).  Before us, the government forthrightly acknowledges that requiring the government's consent to an involuntary dismissal would raise separation-of-powers concerns.  A district court has made the sweeping statement that "Congress did not intend to give the United States a veto power over actions in which it has previously declined to intervene."  United States ex rel. Pedicone v. Mazak Corp., 807 F. Supp. 1350, 1352 (S.D. Ohio 1992).  But its reasoning turned on the fact that the government failed to comply with § 3730(b)(4)'s requirement that it either proceed with the action or notify the court of its decision not to proceed.  Id.  These cases did not confront the situation presented today and do not bind us.

At the appellate level, only the Ninth Circuit has taken a definitive position on whether the last sentence of § 3730(b)(1) grants the government the power to veto voluntary settlements

11

without intervening.[1] That court initially seemed prepared to give teeth to § 3730(b)(1). In <u>United States ex rel. McGough v. Covington Technologies</u>, 967 F.2d 1391, 1397 (9th Cir. 1992), it determined that § 3730(b)(1) requires governmental consent to a voluntary settlement where the relator has failed to notify the government of the settlement terms. By failing to communicate his settlement plans to the government, the relator denied the government the opportunity to intervene and thus failed to represent the government's interests adequately.

But the court changed course in <u>United States ex rel. Killingsworth v. Northrop Corp.</u>, 25 F.3d 715 (9th Cir. 1994). In <u>Killingsworth</u>, the government asked to intervene for purposes of appeal after the district court refused to let it block a False Claims Act settlement. According to the government, the relator was short-changing the government by settling both a False Claims Act suit and a private wrongful termination suit at the same time and shifting most of the recovery into the wrongful termination settlement in order to reduce the percentage of the overall amount that would ordinarily go to the government. The court allowed the intervention for purposes of appeal, but it held that "the

---

[1] One district court anticipated the Ninth Circuit. The Eastern District of Tennessee ruled in a brief opinion that "§ 3730(b)(1) when read in the context of the statute as a whole, is intended to ensure that legitimate claims brought by a <u>qui tam</u> plaintiff are not dismissed before the United States has been notified of the claims and has had an opportunity to decide whether the United States should take over the conduct of the action." <u>United States ex rel. Stenson, Lyons v. Provident Life & Accident Ins. Co.</u>, 811 F. Supp. 346, 347 (E.D. Tenn. 1992). Consequently, the court rejected the government's effort to impose conditions on a voluntary settlement.

government's consent to dismissal is only required during the initial sixty-day (or extended) period in which the government may decide whether to [proceed with the action]." Id. at 723. It distinguished McGough by explaining that the government knew about the settlement and chose not to exercise its right to intervene for good cause in the trial-court proceedings. The government in our case concedes that the result in Killingsworth is directly contrary to its position. It can do nothing but ask us to reject the Ninth Circuit's reasoning.

We find Killingsworth unpersuasive. First, we are unimpressed with the court's contention that the legislative history of the 1986 False Claims Act amendments militates against giving the government the power to veto a settlement. When President Lincoln signed the original 1863 statute, it contained a version of what is now the last sentence of § 3730(b)(1). The original statute, however, contained no mechanism by which the government could take over a qui tam action. In two sets of amendments, Congress has both created and expanded the government's power to assume control of the litigation. See Pub. L. No. 78-213, ch. 377, 57 Stat. 608 (1943) (currently codified at 31 U.S.C. § 3730(d)(2)(A)) (allowing the government to take over the case within sixty days of notification); Pub. L. No. 99-562, 100 Stat. 3154 (1986) (codified at 31 U.S.C. §§ 3730(b)(3) & (c)(3)) (allowing the government both to expand the sixty-day period and to intervene "at a later date" on a showing of good cause).

13

After considering legislators' remarks about the 1986 amendments, the Killingsworth court concluded that the current version of the Act is designed to encourage private litigants to take more responsibility for enforcement. 25 F.3d at 721. "Congress' intent to place full responsibility for False Claims Act litigation on private parties, absent early intervention by the government or later intervention for good cause, is fundamentally inconsistent with the asserted 'absolute' right of the government to block a settlement and force a private party to continue litigation." Id. at 722.

Even if we assume that Killingsworth gauged Congressional intent accurately, intentions alone cannot work a repeal of the last sentence of § 3730(b)(1). Before 1943, when the government had no authority to control claims initiated by relators, that sentence served as the government's one opportunity to influence the litigation in case a relator proposed a settlement that might harm the United States. Although Congress has studied the Act and seen fit to overhaul many of its provisions, it has not chosen to eliminate the sentence we are asked to interpret. As far as we can tell, Congress decided that it should combine its effort to reinvigorate the qui tam provisions of the Act with a continuation of its policy of encouraging the government to monitor relators' actions and step in when a relator is not acting in the best interest of the public. If Congress meant to repeal the government's power to consent to voluntary settlements, it needed to say so explicitly. Otherwise, we must follow our usual

14

procedure of reading the statute and enforcing its dictates if its language is clear.

The statutory language relied on by the government is as unambiguous as one can expect: "The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." Unlike the Killingsworth court, we can find nothing in § 3730 to negate the plain import of this language.

Section 3730(b)(4)(B) gives the relator "the right to conduct the action" when the government declines to assume control. But it does not follow that "[t]he right to conduct the action obviously includes the right to negotiate a settlement in that action." 25 F.3d at 722. A relator has "conducted" an action if he devises strategy, executes discovery, and argues the case in court, even if the government frustrates his settlement efforts. Apparently, a relator "conducts" an action even though the government retains the power to take the more radical step of unilaterally dismissing the defendant. See 31 U.S.C. § 3730(c)(2)(A); Juliano v. Federal Asset Disposition Ass'n, 736 F. Supp. 348, 351 (D.D.C. 1990) ("[T]he Act [does not] state that the qui tam plaintiff remains free to prosecute any person or entity he wishes, provided the government declines to take over the action."), aff'd, 959 F.2d 1101 (D.C. Cir. 1992) (mem.). The power to veto voluntary settlements, then, does not conflict with the relator's statutory right to control the litigation when the government chooses to remain passive. Section 3730(d)(2) states that "the person bringing the action or settling

15

the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages." But again, the government's power to block settlements does not mean that the relator will never be the person settling the claim. This provision does not purport to create an iron-clad "right to settle." See Killingsworth, 25 F.3d at 722-23.

The Killingsworth litigation demonstrates that relators can manipulate settlements in ways that unfairly enrich them and reduce benefits to the government. This case presents a relator who allegedly wants to trade on the defendants' desire to maximize preclusive effects. Plaintiffs ordinarily prefer to keep their options open; agreeing not to bring future suits can be costly. In qui tam litigation, however, there is a danger that a relator can boost the value of settlement by bargaining away claims on behalf of the United States. According to the government, that's what Bortner is attempting: at little cost to himself, he is reaping the benefit of promising that the United States will not make further claims against Philips based on the transactions and occurrences at issue in his suit. If the government decides the settlement isn't worth the cost, § 3730(b)(1) allows the government to resist these tactics and protect its ability to prosecute matters in the future.

For more than 130 years, Congress has instructed courts to let the government stand on the sidelines and veto a voluntary settlement. It would take a serious conflict within the structure of the False Claims Act or a profound gap in the reasonableness of

the provision for us to be able to justify ignoring this language. We can find neither.

## IV.

The district court's settlement order and voluntary dismissal are VACATED, and the case is REMANDED for further proceedings.

17